**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 06-61851-CIV-UNGARO/SIMONTON**

**FEDERAL TRADE COMMISSION,**

     **Plaintiff,**

**v.**

**RANDALL L. LESHIN, et al.,**

     **Defendants**
_____/

## REPORT AND RECOMMENDATION ON MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT AND CERTIFICATION OF FACTS CONSTITUTING CONTEMPT

     **Presently pending before the Court is Plaintiff Federal Trade Commission's Motion for Order to Show Cause Why Defendants Randall L. Leshin, Randall Leshin P.A., Express Consolidation, Inc., Charles Ferdon; and Non-Party Debt Management Counseling Center, Inc., Should not be Held in Contempt for Violating the Corrected Final Judgment of Disgorgement and Consumer Redress (DE # 519). Defendants Randall L. Leshin, Randall Leshin P.A., Express Consolidation, Inc., and Charles Ferdon and Non-Party Debt Management Counseling Center, Inc., have filed a Response to the Motion (DE # 533) and the FTC has filed a Reply (DE # 537). The Motion has been referred to the undersigned Magistrate Judge (DE # 521). An evidentiary hearing was held on the Motion, and post hearing briefs were filed (DE ## 552, 554).**

     **For the following reasons, based upon a review of the record as a whole, as well as the evidence presented at the hearing, the undersigned recommends that the Plaintiff's Motion be Granted and the Contempt Defendants found in civil contempt of the Disgorgement Order. The undersigned further recommends that the Contempt**

Defendants Randall L. Leshin, Randall Leshin P.A., and Charles Ferdon be ordered to either relinquish the accounts set forth below, or pay the sums from those accounts as set forth below, within ten days from the date that the Court adopts this Report and Recommendation or finds the Contempt Defendants in contempt.  If the individual Defendants, Randall Leshin and Charles Ferdon, fail to comply within ten days, the undersigned recommends that they be incarcerated until such time that they comply; and, if the Contempt Defendant Randall Leshin P.A. fails to comply within ten days, the undersigned recommends that Randall Leshin be incarcerated until such time that Randall Leshin, P.A., complies.

I.    BACKGROUND

This matter was initiated when the Plaintiff Federal Trade Commission ("FTC") filed a Complaint and First Amended Complaint seeking a Permanent Injunction and other Equitable Relief against several individuals and entities including Defendants Randall L. Leshin, Randall Leshin P.A., Express Consolidation, Inc., and Charles Ferdon, (collectively "Contempt Defendants") alleging violations of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a), 53 (b), and 57(b); and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108 (DE ## 1, 68).[1]   In general terms, the FTC alleged that Defendants used deceptive and abusive marketing practices related to debt consolidation services offered to consumers nationwide (DE # 68).

---

[1] Debt Management Counseling Center, Inc., was not named as Defendant in the original action, but was named as a Contempt Defendant in the contempt action related to violations of the Stipulated Injunction.  Thus, Debt Management Counseling Center, Inc., is included in the findings related to contempt of the Court's Disgorgement Order and for purposes of this Report is included as one of the "Contempt Defendants."

On May 5, 2008, the action was settled through the Court's entry of a Stipulated Injunction and Order between the FTC and the named Defendants (DE # 321).[2]  The Stipulated Injunction provided, among other things, that the Defendants would no longer offer debt consolidation services in states where the Defendants had failed to comply with the state's legal requirements related to that business, and further provided for the Court to appoint a temporary monitor to oversee the Defendants' compliance with their obligations related to certain payments and other notification and financial responsibilities as set forth in the Stipulated Injunction.  Sometime thereafter, on April 7, 2009, the Court issued an Order finding the Defendants in contempt for violating certain sections of the Stipulated Injunction (DE # 395).  In that Order, the Court ordered that the Defendants disgorge certain monies collected from consumers after the date that the Stipulated Injunction was entered; and, directed the Court-Appointed Monitor to determine the exact amount to be disgorged (DE # 395 at 45).

The Monitor submitted several reports to the Court over the course of the next several months (DE ## 449, 451, 461, 456, 477, 483). On December 15, 2009, the Monitor submitted its Eighth Report to the Court, wherein the Monitor concluded that between May 5, 2008 and July 31, 2009, the Contempt Defendants collected fees in the amount of $581,198.71, and, after July 31, 2009, collected an additional $13,789.19, for a total of $594,987.90 to be disgorged pursuant to the Order of the Court (DE # 477).

On January 28, 2010, the Court issued a Corrected Final Judgment of Disgorgement and Consumer Redress ("Disgorgement Order") directing the Contempt

---

[2] Two other Defendants, Consumer Credit Consolidation, Inc., and Maureen A. Gaviola, were also named in this action but settled with the FTC through a separate Stipulated Injunction, and thus were not named are not involved in the instant Motion for Civil Contempt (DE ## 320, 321).

Defendants to disgorge the amount of $594,987.90, within thirty days, to compensate the consumers whose money was taken in violation of the Stipulated Injunction and Order (DE # 489).  The Contempt Order states, *inter alia*, "This order is to remedy contempt via disgorgement and is not a money judgment." (DE # 489 at 2).  The Order also states, "Contempt Defendants relinquish all dominion, control, and title to any funds disgorged to the fullest extent permitted by law." (DE # 489 at 4).  Defendants appealed the Court's decision and Disgorgement Order to the Eleventh Circuit Court of Appeals (DE # 492).

On June 23, 2010, the FTC filed a Motion for Order to Show Cause why the Contempt Defendants, including Non-Party Debt Management Counseling Center, Inc., ("DMCCI") should not be held in contempt for violating the Corrected Final Judgment of Disgorgement and Consumer Redress (DE # 519).  The Defendants filed an Opposition (DE # 533), and the FTC filed a Reply (DE # 537).[3]

On August 9, 2010, an evidentiary hearing was held on the Motion for Civil Contempt before the undersigned (DE # 543).  At the hearing, both individual Defendants, Charles Ferdon and Randall Leshin, testified regarding their respective abilities to comply with the Disgorgement Order.  In addition, Randall Leshin testified about the ability of the Contempt Corporate Defendants, Randall Leshin, P.A., Express Consolidation, Inc., and DMCCI to comply with the Disgorgement Order.

The Parties thereafter submitted post-hearing briefs which set forth their

---

[3]  The FTC has also filed a Supplemental Motion for Order to Show Cause Why Defendants Should Not Be Held in Contempt for Violating the Stipulated Injunction (DE # 530).  The Defendants have filed a Response in Opposition to that Motion (DE # 535).  That Motion raises many of the same issues raised in the instant Motion, but raises issues related to the Contempt Defendants' failure to enter into an agreement with the Monitor.  Thus the Motion is resolved by separate Order, and in conjunction with the Defendants' Motion to Appoint Replacement Monitor (DE # 536).

respective positions on whether certain State of Florida exemptions should apply to the monies held by the Defendants (DE ## 552, 554).

On November 23, 2010, the mandate and opinion issued by the United States Court of Appeals for the Eleventh Circuit, affirming the District Court's Order of Contempt and Final Order of Disgorgement, was filed in this matter (DE # 555).

II.    **INTRODUCTION**

As discussed in more detail below, the present dispute centers around whether the individual Contempt Defendants Charles Ferdon and Randall Leshin, and the Corporate Contempt Defendants Randall Leshin P.A., Express Consolidation, Inc., and Non-Party Debt Management Counseling Center, Inc., have, in good faith, attempted to comply with the Disgorgement Order.  Mr. Ferdon and Mr. Leshin claim that they have attempted to comply with the Order  and argue that their income and assets are exempt from creditors under Florida law.  They therefore urge the Court to refrain from exercising the Court's discretion to ignore the stated exemptions and, further request that the Court not require disgorgement.

The FTC, on the other hand, contends that Contempt Defendants have not established a good faith effort to comply with the Disgorgement Order, as evidenced by their income, lifestyle and their failure to turn over their accumulated assets.  Thus, the FTC seeks to hold the Contempt Defendants in contempt and seeks a Court order that requires them to disgorge certain specified assets identified by the FTC, in order for the Contempt Defendants to purge themselves of that contempt.[4]  According to the FTC, the

---

[4] The FTC, however, has not sought payment of the value of all of the Defendants' assets, such as their homesteaded homes; nor has the FTC sought any lump sum of money based on the individual Defendants' income level.  Rather, as stated above, the FTC has only sought to require the Defendants to turn over certain specified assets,

value of these assets is $82,007.72 as to Mr. Leshin and the Corporate Defendants, and $21,4440.05 as to Mr. Ferdon, for a total of $103,447.77 for the Contempt Defendants (DE # 519 at 11-12).[5]

### III.   PARTIES' POSITIONS

#### A.   FTC's Position

In its Motion for Contempt, the FTC requests, *inter alia*, that the Court hold individual Defendants Randall Leshin and Charles Ferdon, as well as corporate entities, Randall Leshin, P.A., Express Consolidation Inc., and Debt Management Counseling Center, Inc., in contempt for failing to pay any monies towards satisfying the $594,987.90 amount as required by the Disgorgement Order (DE # 519).  According to the FTC, on March 1, 2010, the Contempt Defendants claimed that they lacked the ability to pay the disgorgement amount and submitted financial information in support of their assertion. Specifically, the Defendants provided Financial Statements which listed various assets held by each of the Contempt Defendants.  The FTC contends that the information contained in those Statements indicates that the individual Defendants, Randall Leshin and Charles Ferdon, hold assets worth nearly $100,000.00 and thus those Defendants are able to comply with the Disgorgement Order.   In support of its position, the FTC attached an appendix to its Motion which asserted that the Defendants held the following assets: (DE # 519 at 11-12).

---

such as retirement and college savings accounts, to purge themselves of contempt.

[5]  The FTC has not provided a value with respect to other specified assets that were identified by the FTC in its papers, and/or at the evidentiary hearing.  As to the total amount to assessed to Mr. Leshin, the amount includes funds that the FTC has identified as being held by Randall Leshin, P.A., as well.

### Charles Ferdon

1.   Funds in three Bank of America Accounts valued at $11,923 on May 13, 2010; and,

2.   Funds in a college savings plan with Florida Prepaid Program valued at $9,517.05 on April 27, 2010.

### Randall Leshin

1.   Cash value of life insurance policy valued at $23,253.00 on March 4, 2010;

2.   IRA funds in a Prudential annuity contract valued at $35,545.43 on April 5, 2010;

3.   Funds in two Pershing brokerage accounts valued at $4,363.55 according to statements dated March 31, 2010 and April 30, 2010;

4.   Funds in three personal Bank of America Accounts and one Washington Mutual Account (now Chase) with the total value of $1,517.74 at May 11, 2010.

### Corporate Defendants

1.   Funds in four bank accounts, referred to as recovery, tax, payroll and operating accounts valued at $17,326.46 as of May 18, 2010;

2.   Funds in a Randall Leshin, P.A. savings account at Bank of America valued at $1.54 as of March 4, 2010.

(DE # 519 at 11-12).  In addition, the FTC asserts that during depositions taken of the individual Defendants after the instant Motion was filed, the Defendants testified that they had forgotten to list certain additional assets in the Financial Statements, which also could be used to satisfy the Disgorgement Order.

Finally, the FTC argues that the individual Defendants have continued to spend

7

money on "luxuries" since the entry of the Disgorgement Order which undermines the Defendants' contention that they are unable to pay the sums required under that Order. Therefore, the FTC requests that the individual Contempt Defendants be incarcerated until they relinquish their individual and corporate assets that may be used to satisfy the Disgorgement Order (DE # 519).[6]

####    B.    Contempt Defendants' Position

The Individual Contempt Defendants assert that they are unable to satisfy the Disgorgement Order and contend that many of the funds that the FTC is seeking to obtain are protected by several Florida State exemption statutes.  Specifically, Defendants Ferdon and Leshin assert that their homes may not be levied to satisfy the Disgorgement Order because they are homestead properties and protected under Florida law.  Similarly, the individual Defendants assert that they are exempt from having their wages garnished pursuant to Florida Statute § 222.11.

Further, the Contempt Defendants assert that although they have offered to settle the amount due under the Disgorgement Order with the FTC, that the FTC has not been willing to do so.  Defendant Ferdon contends that he voluntarily liquidated a number of his exempted assets with the intent of providing those monies to the FTC, but the FTC would not discuss settling the matter with him.

At the evidentiary hearing on the Motion, both of the individual Defendants, Charles Ferdon and Randall Leshin, testified regarding their current financial condition

---

[6] In the Motion, the FTC submits that it only seeks to have those corporate assets relinquished that are not essential to servicing existing debt management contracts with consumers (DE # 519 at 2).  The distinction between the corporate assets held for servicing existing debt management contracts and those otherwise held by the Contempt Corporate Defendants is discussed in detail below.

and their ability to satisfy the Disgorgement Order.

IV.    **EVIDENTIARY HEARING**

An evidentiary hearing was held on the FTC's Contempt Motion on August 9, 2010.  At the evidentiary hearing, the FTC reiterated the position set forth in its papers; and, further asserted that some of the testimony at the hearing by Defendant Leshin revealed that there were additional assets that Mr. Leshin had failed to disclose that should be used to satisfy the Disgorgement Order.

Further, the FTC explained that to the extent the FTC introduced evidence regarding the individual Defendants' spending habits, such evidence was intended to demonstrate that the Defendants had not used their best efforts to satisfy the disgorgement amount and had self-created any inability to pay, and not to suggest that this Court should direct that Defendants pay a portion of their current wages to satisfy the obligation (DE # 545 at 182, 196).

The FTC also made clear at the hearing that it was not seeking to have the Court order the individual Defendants to turn over their homesteaded properties to satisfy the Disgorgement Order (DE # 545 at 183).

The FTC also clarified that its request that the individual Defendants be incarcerated sought to have Mr. Ferdon and Mr. Leshin found in contempt and incarcerated until they turned over the assets listed in the Contempt Motion, and in Mr. Leshin's case, the other assets identified for the first time at the evidentiary hearing (DE # 545 at 180).  The FTC asserted that, thereafter, it would likely seek to have the remaining balance of the Disgorgement Order converted to a money judgment, along with the interest due on that balance (DE # 519 at 10 n. 30; 519-1 (proposed order) at § V; 545 at 180-c81, 271).

9

In Response, the Contempt Defendants reiterated that they are unable to satisfy the Disgorgement Order which is evidenced by the Financial Statements and supporting documents submitted by each of the Contempt Defendants.

Defendants also argued that Mr. Ferdon and Mr. Leshin's wages are protected from either garnishment or attachment under the applicable Florida Statute because both individual Defendants are the head of their respective households (DE # 545 at 199-200).  Defendants also again asserted that other exemptions available under Florida State law should apply, and thus, the Defendants' reliance on those exemptions is appropriate and demonstrates the Defendants' good faith in attempting to comply with the Disgorgement Order (DE # 545 at 202-203).

V.     **CERTIFIED FINDINGS OF FACTS** [7]

The undersigned makes the following findings of fact, which were proven by clear and convincing evidence, and which are certified to the District Court as establishing contempt of court.[8]

Both Individual Defendants Charles Ferdon and Randall Leshin were aware of and understood that the Corrected Final Judgment of Disgorgement and Consumer Redress (DE # 489) issued by the Honorable Ursula Ungaro on January 28, 2010, required the Defendants to pay $594,987.90 by March 1, 2010. (Hr'g Tr. 67).[9]

---

[7] To the extent that the Findings of Fact may be construed as Conclusions of Law the undersigned intends for them to be construed as such.

[8]  These facts are established through the testimony of Defendants Charles Ferdon and Randall Leshin and the exhibits introduced at the evidentiary held on August 9, 2010, as well as, Orders contained in the Record.

[9] Throughout this Report and Recommendation, references to the August 9, 2010 Evidentiary Hearing held by the undersigned will be referred to as (Hr'g. Tr.).  The transcript from the evidentiary hearing has been filed in this matter and is Docket Entry #

Neither of the Individual Defendants, Charles Ferdon and Randall Leshin, have made any payments towards the satisfaction of the $594,987.90 that they were ordered to pay in the Disgorgement Order (DE # 489) issued by the Honorable Ursula Ungaro on January 28, 2010 (Hr'g Tr. 67).

Both individual Defendants attempted to negotiate the amount under the Disgorgement Order with the FTC, and elected not to pay any monies towards satisfying the Order when the FTC would not agree to accept a lower amount than that ordered in the Disgorgement Order.

All of the Corporate Entities, Randall Leshin, P.A., Express Consolidation, Inc., and Debt Management Counseling Center, Inc., are owned and operated by Individual Defendant Randall Leshin. None of the Corporate Entities have made any payments towards the satisfaction of the $594,987.90 that they were ordered to pay in the Disgorgement Order (DE # 489) issued by the Honorable Ursula Ungaro on January 28, 2010.

On March 1, 2010, Counsel for the Contempt Defendants forwarded a letter to the FTC, informing the Agency that the Contempt Defendants lacked the ability to pay the disgorgement amount. (Pl's Hr'g Ex. PCX 42). On March 11, 2010, Counsel for the Contempt Defendants, forwarded another letter to the FTC, wherein the Defendants offered to settle the matter with the FTC, but reiterated that none of the Defendants had the ability to pay the disgorgement figure. (Hr'g Ex. 4). In that letter the individual

---

545. In addition, references to exhibits introduced by the Defendants at the hearing are designated as (Hr'g Ex. __), while exhibits introduced only by the FTC at the hearing are designated as (PCX Hr'g Ex. ____) and correspond to the exhibits appended to the FTC's Motion to Compel (DE # 519). Where both parties have introduced identical exhibits, for the sake of consistency and convenience, those exhibits are also referred to as (Hr'g Ex. ___).

Defendants offered to liquidate their respective retirement accounts but asserted that such funds were "exempt under Florida Statutes Chapter 222 and the Florida Constitution." *Id.* On March 17, 2010, the FTC responded to Contempt Defendants' Counsel's correspondence and indicated that the financial information that the FTC had received from the Defendants did not demonstrate that the Defendants were insolvent, and thus the FTC demanded that the Contempt Defendants pay the disgorgement amount. (Hr'g Ex. 11). The letter further stated that although the FTC did not concede that the Defendants were unable to pay the disgorgement amount, the FTC "encouraged Contempt Defendants to pay the amount they claim they are able to pay." *Id.* The letter closed with the FTC's bank account information "in the event that Contempt Defendants decide to make a payment." *Id.*

## CHARLES FERDON

On or about March 3, 2010, Mr. Ferdon, in conjunction with his attorneys, executed, under penalty of perjury, a Financial Statement that was submitted to the FTC in order to identify Mr. Ferdon's income, assets and liabilities at the time of the Disgorgement Order. (Hr'g Tr. 29,  Hr'g Ex. 57 FTC 004000-004019).   In that Statement, Mr. Ferdon indicated that his assets totaled $344,358.39 and his liabilities totaled $775,508.86, including the amount owed pursuant to the Disgorgement Order (Hr'g Tr. 55-57; Hr'g Ex. 57 FTC 004013).

Mr. Ferdon has been married for approximately 17 years to Devon Ferdon. (Hr'g. Tr. 25-26).  He, his wife and their five-year old daughter reside in a home that is designated as his homestead property for ad valorem tax purposes.  In 2009, the property was valued at approximately $163,920. (Hr'g Tr. 31, Hr'g Ex. 57 FTC 004003, Hr'g Ex. 61, 62). In 2010, the property  was assessed to be worth $124,810. (Hr'g Tr. 31, Hr'g

Ex. 57 FTC 004003, Hr'g Ex. 61, 62).  Mr. Ferdon's wife works outside of the home as a sales representative and earns approximately $43,000 a year in that position (Hr'g Tr. 29, Hr'g Ex. 57 FTC 004001).  Mr. Ferdon has monthly household and personal expenses in the amount of $6,035.44 and the combined monthly income of he and his wife is $6,470.38 (Hr'g Ex. 57 FTC 004014).  Mr. Ferdon's monthly expenses include having his house cleaned every two weeks, his daughter's tennis lessons estimated to cost $30.00 per month, eating out two to three times a week, and cable television. (Hr'g Tr. 69-70).

Mr. Ferdon is currently employed by Randall Leshin, P.A. (Hr'g. Tr. 26).  At one time, he was an officer and director of DMCCI and was previously employed by Express Consolidation, Inc. (Hr'g. Tr. 26).  Mr. Ferdon has never held an equity interest in any of the corporations involved in this case and does not otherwise hold an equity interest in any business, corporation, enterprise or partnership.  (Hr'g. Tr. 27).

In 2008, Mr. Ferdon earned income of approximately $88,000, consisting of $82,331 paid by Express Consolidation and $5,661 paid by Debt Management Counseling Center. (Hr'g Tr. 31, Hr'g Ex. 57 FTC 004003, Hr'g Ex. 59).  In 2009, he earned income of approximately $70,000 consisting of $68,790 paid for his work as a legal assistant at Randall Leshin, P.A., and $1,734 paid by Debt Management Counseling Center. (Hr'g Tr. 31,  Hr'g Ex. 57 FTC 004003, Hr'g Ex. 60).  As of March 2, 2010, Mr. Ferdon had earned $12,263.75 from Randall Leshin, P.A. for the year 2010. *Id.*

At the time that Mr. Ferdon executed the 2010 Financial Statement with the FTC, he held an interest in three Bank of America Accounts: one held jointly with his wife with a balance of $615.96; one held with his mother, Valorie Ferdon, with a balance of $9.18; and one investment account held solely in his name with a balance of $282.36.  (Hr'g Tr. 41, Hr'g Ex. 57 FTC 0040016, Hr'g Ex. 65).

The Bank of America account that Mr. Ferdon holds jointly with his wife, which was identified in the 2010 Financial Statement, is an account where both Mr. Ferdon and his wife regularly deposit their respective pay checks.[10] (Hr'g Tr. 42, Hr'g Ex. 57 FTC 004016, Hr'g Ex. 65).  Mrs. Ferdon pays all of the couple's bills out of this joint account. (Hr'g Tr. 42, 46-47, 50-52).

The Bank of America account that Mr. Ferdon holds with his mother was established upon his father's death a few years ago, and primarily serves as a vehicle to provide his mother with funds, when needed, if she runs out of money at the end of a particular month. (Hr'g Tr. 44).  None of Mr. Ferdon's money is currently deposited into that account, but rather the U.S. Treasury deposits his mother's disability and social security checks into the account. *Id*.[11]

Mr. Ferdon and his wife hold a Life Insurance Policy wherein each spouse is named as the beneficiary.  (Hr'g Ex. 57 FTC 004007).  The Policy has a surrender value of $4,288.72. (Hr'g Tr. 32,  Hr'g Ex. 57, FTC 004007).

In January of 2005, Mr. Ferdon established a college savings plan with the Florida Prepaid College Board which was valued at $9,517.05 on April 27, 2010.  (Hr'g Tr. 29; Hr'g Ex. 57 FTC004016;  Hr'g Ex. 68 FPCB 000001-000037).  This plan is paid on a monthly basis by Mrs. Ferdon out of the funds deposited into the Ferdon's original joint account. (Hr'g Tr. 51-52).  There is no penalty for withdrawing the money out of the prepaid

---

[10] The Bank of America Account originally held by Mr. Ferdon and his wife ends in the numbers "4523".

[11]  Although the FTC has submitted the Bank of America Statement for the three accounts currently held by Mr. Ferdon, it is not entirely clear from the redacted Statement which accounts represent the account jointly held with his mother and which account is held jointly with his wife. (PCX Hr'g Ex. 45). Rather, the FTC seeks the entire sum identified in the Statement of $11,923 as of May 10, 2010 (DE # 519 at 11).

savings plan. (Hr'g Tr. 52).  According to the records subpoenaed by the FTC from the

Florida Prepaid College Board, the payments on this account were current through April

2010, the month that the Board responded to the FTC's subpoena. (Hr'g Ex. 68 FPCB

000021-000025).

In April of 2004, Mr. Ferdon established a ROTH IRA which was valued at

$2,919.38 at the time that he executed the Financial Statement in March of 2010. (Hr'g Tr.

33,  Hr'g Ex. 57, FTC 004007).  In October of 2006, Mr. Ferdon enrolled in a 401 (k) plan

through Express Consolidated, Inc., which as of March 2010, had a surrender value of

$10,958.33.  (Hr'g Tr. 36, Hr'g Ex. 57 FTC 004007-004018).  The contributions made by Mr.

Ferdon into this account came from money withheld from his wages. (Hr'g Tr. 37-38).  In

January of 2009, Mr. Ferdon enrolled in a 401(k) plan through Randall Leshin, P.A., that

in March of 2010 had a surrender value of $3,104.06. (Hr'g Tr. 36,  Hr'g Ex. 57, FTC

004018).

In March of 2010, after he submitted his Financial Statement to the FTC, Mr.

Ferdon liquidated his ROTH IRA, IRA and the 401(k) account he held with Express

Consolidated, Inc., and placed those monies into a newly-opened Bank of America joint

savings account with his wife. (Hr'g Tr. 33-36, 40; Hr'g Ex. 67, DE # 533-2 at 19-).[12]  Mr.

Ferdon was unable to liquidate the 401(k) account associated with Randall Leshin, P.A.,

because he remains an employee of that entity. (Hr'g Tr. 36).  Through the liquidation of

those retirement accounts, Mr. Ferdon placed approximately $11,000  into the account

(Hr'g Tr. 40).

In addition, Mr. Ferdon liquidated the bank account held solely in his name and

---

[12] The "new" Bank of America savings account that Mr. Ferdon jointly holds with his wife
ends in the numbers "7293".

also deposited those funds into the new Bank of America account where he had placed the funds from his liquidated IRAs and 401(k) accounts. (Hr'g Tr. 41,  Hr'g Ex. 65, 66, 67). Mr. Ferdon also liquidated the stocks associated with the account held solely in his name and thereafter placed an additional approximately $700.00 in the newly-created Bank of America joint savings account. (Hr'g Tr. 41). Mr. Ferdon has not paid any monies from the new joint bank account towards the satisfaction of the Disgorgement Order. (Hr'g Tr. 36-37).

At the time that Mr. Ferdon executed the 2010 Financial Statement, he and his wife owned two SUVs; one was a 2008 Ford Escape and, the second was a 2006 Chrysler Pacifica (Hr'g Tr. 53, Hr'g Ex. 57 0004008).  Since that time, the Ferdons have traded in the Chrysler for a Mazda CX-7, but had to take out a loan to obtain the new car, and hold no equity in that new car. (Hr'g Tr. 54-55).  Mr. Ferdon and his wife use their respective vehicles to commute to work. *Id*.

## RANDALL LESHIN

Beginning in January of 2007, Mr. Leshin, in conjunction with his attorneys, has completed at least four Financial Statements, under penalty of perjury, that were submitted to the FTC in order to identify Mr. Leshin's income, assets and liabilities. (Hr'g Tr. 87-89,  Hr'g Ex. 6, FTC 004056-004074).  In the March 2010 Statement, Mr. Leshin reported that in 2008, he was paid approximately $395,268.00 in wages by Randall Leshin, P.A. (Hr'g Tr. 90; Hr'g Ex. 6 FTC 004058).[13]  He also reported that in 2007, his

---

[13] Mr. Leshin's 2008 1040 Tax Return, submitted into evidence at the evidentiary hearing, reflects that for the 2008 tax year, Mr. Leshin was paid $104,000 in wages from Randall Leshin, P.A., and an additional $297,745.00 in other income from both Randall Leshin PA and Debt Management Counseling Center for a total of $401,745.00. (Hr'g Ex. 7 FTC 004075, FTC 004084).  In addition, according to the tax return, Mr. Leshin received an additional $9,717.00 from Express Consolidation Inc. (Hr'g Ex. 7 FTC 004075, FTC

income was $513,662; and did not state what his income was for the years 2006 and 2005 (Hr'g Ex. 6 FTC 004058).  In a previously submitted Financial Statement dated December 19, 2007, Mr. Leshin reported that his income received to date in 2007 from Randall Leshin P.A. was $750,000 and estimated his income from Express Consolidation, Inc., was $30,000; his income for 2006 was $787,708 from Randall Leshin P.A. and $86,664.65 from Express Consolidation, Inc.; and his income for 2005 was $675,914 from Randall Leshin, P.A. and $33,360.65 from Express Consolidation, Inc. (Hr'g Ex. 9 Venable 341).[14]

Randall Leshin has been married to Julie Leshin for the past 28 years and they have two children, a son who is 20 years old, and a daughter who is 22 years old. (Hr'g Tr. 84).  Mr. Leshin's son is in his junior year at the University of Central Florida. (Hr'g Tr. 85).  Mr. Leshin's daughter graduated from college in May 2010 and currently works for the AARP. (Hr'g Tr. 85).  Mr. Leshin supports his wife and son completely; and, before his daughter graduated, he provided more than half of her financial support. (Hr'g Tr. 85).

Mr. Leshin resides with his wife in a home in Fort Lauderdale, Florida that is designated as a homestead property for ad valorem tax purposes; and, that Mr. Leshin valued at $425,000 in March of 2010 (Hr'g Ex. 6. FTC-004064).  He and his wife own the home free and clear, as husband and wife by the entireties, and have lived there for twenty-one years. (Hr'g Tr. 97).  Mr. Leshin does not own any other investment property or real estate. (Hr'g Tr. 97).  Mrs. Leshin does not work outside of the home. (Hr'g Tr. 85).

Randall Leshin has been a member of the Florida Bar for 27 years and practices

─────────────────────

004089).

[14] Mr. Leshin's 2007 1040 Tax Return submitted into evidence at the evidentiary hearing reflects that for the 2007 tax year, Mr. Leshin's income was $529,894. (Hr'g Ex. 8 FTC 004100).

primarily in the area of credit collections, bankruptcies, and commercial litigation (Hr'g Tr. 77-78).  He is the the only shareholder, officer and director of Randall Leshin, P.A., a law firm in business for the past twenty-three years. (Hr'g Tr. 80).   Mr. Leshin currently receives compensation from Randall Leshin, P.A. in the amount of $200,000 a year. Randall Leshin, P.A. is a Subchapter S Corporation and all of the income to that entity flows through to Mr. Leshin. (Hr'g Tr. 105).

Mr. Leshin is also the executive director, sole officer, and one of five members of the board of directors of Express Consolidation, Inc. (Hr'g Tr. 82).  The Law Firm, Randall Leshin, P.A., receives a weekly stipend from Express Consolidation. *Id*.  Mr. Leshin does not receive direct compensation from Express Consolidation but he receives non-cash benefits including an expense account and a cell phone. (Hr'g Tr. 83).  He is issued an IRS 1099 for the benefits he receives from Express Consolidation, and pays taxes on those benefits.  (Hr'g Tr. 83).

Mr. Leshin testified that his income in 2009 was approximately $200,000.00 and will likely be the same for 2010. (Hr'g Tr. 90-91).  He further reports that during the summer of 2010, he decided to not receive pay from his company so the company could meet its "obligations". (Hr'g Tr. 90-91). In his March 2010 Financial Statement, he lists his income received to date as being "approx $35,000," but also lists his average monthly income as "approx $30,000." (Hr'g Ex. 6 FTC 004058, 004069).  Mr. Leshin's 2010 Financial Statement makes no specific reference to the non-cash benefits received from Express Consolidation, Inc., and does not reference the 1099 that he receives from that entity. (Hr'g Tr. 140).

According to his May 2008 Financial Statement, at that time, Mr. Leshin held approximately $1,015,117.20 in assets, with $114,073.67 of that amount consisting of an

educational trust fund that he held for his children. (Hr'g Tr. 94, Hr'g Ex. 9 Venable 351, Venable 354).  His assets at that time included his homesteaded residence which was valued at $464,600. (Hr'g Ex. 9, Venable 347).  Mr. Leshin liquidated many of the assets including the educational trust fund in order to settle the case with FTC in May of 2008. (Hr'g Tr. 94-95).  His March 2010 Financial Statement lists his assets as $505,492. (Hr'g Ex. 6 FTC 004071).

Mr. Leshin currently owns a life insurance policy issued by State Farm which names his wife as the beneficiary. (Hr'g Tr. 95,  Hr'g Ex. 9 Venable 345, Hr'g Ex. 6 FTC 004071).  In December of 2007, the life insurance policy had an estimated surrender value of $60,000, and in March of 2010, had an estimated surrender value of $23,253. (Hr'g Tr. 95, Hr'g Ex. 9 Venable 345, Hr'g Ex. 6 FTC 004071).  Mr. Leshin borrowed money against the cash value of the life insurance policy after the settlement of the FTC case and used the money for "regular living purposes." (Hr'g Tr. 96).

Mr. Leshin stated at the hearing that his current expenses include having to pay the legal fees associated with the instant litigation, in the amount of $1,000 a week. (Hr'g Tr. 99, 149). The balance owed on those legal fees is between $50,000 and $60,000. (Hr'g Tr. 99).  However, Mr. Leshin does not pay that amount personally, rather his legal fees are paid by DMCCI, one of the corporate entities operated by Mr. Leshin. (Hr'g Tr. 150). Mr. Leshin did not identify the legal fees paid by DMCCI as income on his Financial Statement submitted to the FTC in March 2010. (Hr'g Tr. 151; Hr'g Ex. 6 FTC 004058).

Mr. Leshin holds an IRA and an annuity with Prudential that was funded from the IRA. (Hr'g Tr. 104).  As of April 5, 2010, the IRA funds in the Prudential annuity contract were valued at $35,545.43 with a surrender value of $33,102.58. (PCX Hr'g Ex. 43).

Mr. Leshin also holds two funds in Pershing brokerage accounts that as of April

30, 2010, have a total value of $4,363.55. (Hr'g Tr. 108, 111; PCX 47; Hr'g Ex. 6 FTC 004074). The accounts are both money market accounts and are what remain in a 401(k) plan that was liquidated to settle the case with the FTC in May of 2008. (Hr'g Tr. 108; Hr'g Ex. 9 Venable 356). The 401(k) plan was established with Randall Leshin P.A., in January of 2009, and was accepted by the IRS as a qualified retirement plan. (Hr'g Tr. 109-110; Hr'g Ex. 3).

Mr. Leshin is named as an account holder in three personal Bank of America Accounts which as of May 11, 2010 had a combined balance of $1,517.74. (DE # 519 at 11; Hr'g Tr. 111; PCX Hr'g Ex. 43). One of the accounts, which as of March 2010, had a balance of $81.41, was created for and utilized by Mr. Leshin's son, who uses a debit card to access the funds deposited by Mr. Leshin into the account. (Hr'g Tr. 111; Hr'g Ex. 6 FTC 004073). Typically, Mr. Leshin deposits $600 per month into the account which is taken from Mr. Leshin's wages. (Hr'g Tr. 111; Hr'g Ex. 6 FTC 004073). Mr. Leshin pays for his son's rent out of a different fund of money (Hr'g Tr. 113-114).

The second account, which as of March 2010, had a balance of $258.43, was created for and utilized by Mr. Leshin's daughter, who deposits her own wages into the account, along with sums deposited by Mr. Leshin. Over the past few years, Mr. Leshin was placing $2,000 each month from his wages into the account which his daughter used to pay her rent. (Hr'g Tr. 113-114). Since she is now working full-time, he has reduced this deposit to $1,400 per month into the account (Hr'g Tr. 114).

The third account, which as of March 2010 had a balance of $64.44, is a money market account that Mr. Leshin uses as an overdraft account in case either his son or daughter overdraws their personal accounts. (Hr'g Tr. 114). Mr. Leshin deposits money in that account from his wages, and usually maintains approximately a couple of

hundred dollars in that account. (Hr'g Tr. 114-115).

Mr. Leshin also holds a personal account with Chase Bank which is used to pay household expenditures and to give his wife money (Hr'g Tr. 115; Hr'g Ex. 6 FTC 004073). Mr. Leshin does not have a joint bank account with his wife and she does not have access to his personal bank account. (Hr'g Tr. 115).   However, Mrs. Leshin owns a bank account in her own name. (Hr'g Tr. 135).  Mr. Leshin gives Mrs. Leshin $3,000 each month which she uses for household expenses. (Hr'g Tr. 135).  Mr. Leshin did not disclose Mrs. Leshin's bank account to the FTC on his Financial Statements, even though the form inquires about accounts held by spouses, and further did not otherwise disclose Mrs. Leshin's account to the FTC prior to the evidentiary hearing (Hr'g Tr. 147). Mrs. Leshin has no other source of income that is deposited into the account.

Mr. Leshin's monthly expenditures approximate $25,000 and, according to the 2007 Financial Statement executed by Mr. Leshin, include household expenses of $6,000 per month, clothing expenses of $1,000 per month, food expenses of $1,600 per month and miscellaneous expenses of $2,000 per month. (Hr'g Tr. 146-147; Hr'g Ex. 9 Venable 352).

Mr. Leshin and his wife own two vehicles valued at $9,000 (Hr'g Tr. 97).  Mr. Leshin drives a 2001 SUV with 160,000 miles on it. (Hr'g Tr. 97).

<u>CORPORATE DEFENDANTS</u>

Express Consolidation, Inc., no longer transacts business directly. (Hr'g Tr. 119).  A Financial Statement filed on behalf Express Consolidation, Inc., submitted in March of 2010, indicates that at that time the entity held four financial accounts, consisting of an Operating Account in the amount of $16,356.18; a Trust Account with a balance of $137,384.50; a Disbursement Account with a balance of

$188,149.53; and, a Payroll Account with a balance of $6,522.05.  (Hr'g Ex. 14

FTC–004128).  The Cash Balance Sheet for that entity through December 2009, shows a

negative cash balance of $13,271,71 and an overall Balance Sheet through December

2009 lists the total assets of Express Consolidation as $299,343.10, with total liabilities

at $757,367.89. (Hr'g Tr. 118-119; Hr'g Ex. 18, 19).

DMCCI submitted a Financial Statement to the FTC, as well as tax returns for 2007

and 2008, and a balance sheet for the company dated December 31, 2009 (Hr'g Tr. 116-

117; Hr'g Ex. 37, 38, 39, 40). DMCCI is a for-profit company that was formed after the

lawsuit was initiated by the FTC, and provides credit counseling to it clients. (Hr'g Tr.

118). All income received by DMMCI passes through to Mr. Leshin. (Hr'g Tr. 118).  DMCCI

pays $1,000 per week towards Mr. Leshin's legal fees incurred related to this litigation.

(Hr'g. Tr. 150).[15]  According to the Financial Statements and financial documents

provided by DMCCI, that entity holds no liquid assets that are available for

disgorgement. (Hr'g Tr. 117-118).

Randall Leshin, P.A., Mr. Leshin's law firm, contracts with some of the consumers

whose debts are being administered by DMCCI, and provides consumer debt counseling

and debt settlement services to those consumers. (Hr'g Tr. 120, 128-129).  Randall

Leshin, P.A. also has other clients who are not debt settlement clients, but rather are

creditors for whom the firm provides collection services. (Hr'g .Tr. 122).  The collection

service portion of the firm generates money by collecting on creditors' accounts that

have been placed with the firm. (Hr'g Tr. 128).

---

[15] Initially at the evidentiary hearing, Mr. Leshin testified that he personally paid the
$4,000 per month legal expenses associated with litigating this case. (Hr'g Tr. 98-99, 149-
50).

Randall Leshin, P.A., holds funds related to its collection services practice in four bank accounts which are identified as Recovery, Tax, Payroll and Operating Accounts. (Hr'g Tr. 122; Hr'g Ex. 70).  As of May 18, 2010, the Accounts held a collective balance of $17,326.46 (DE # 519 at 12).  The FTC seeks to have the funds from these Accounts used to satisfy the Disgorgement Order (DE # 519 at 12).  In the 2010 Financial Statement submitted to the FTC by Randall Leshin, P.A., these four bank accounts were *not* identified. (Hr'g Tr. 144, Hr'g Ex. 27, FTC-004212).  The Accounts were, however, subsequently identified at Mr. Leshin's deposition taken in May of 2010. (Hr'g Tr. 145, Hr'g Ex. 12).

The Tax Account holds funds paid by the employer for the employees of Randall Leshin, P.A., that are earmarked for payment of IRS payroll taxes, including FICA, unemployment and social security.  The account also holds funds withheld from the employees themselves for payment of those same taxes. (Hr'g Tr. 122-123).  There are no other monies deposited into that account that are not paid out to either to the State of Florida or the Federal Government. (Hr'g Tr. 125).

The Payroll Account is used to pay the wages of the employees of Randall Leshin, P.A., not including Mr. Leshin (Hr'g Tr. 122-123, 125). The Account is funded every two weeks from the Operating Account when payroll is made. (Hr'g Tr. 125).  Mr. Leshin keeps an additional couple hundred dollars in the account to cover any excess payroll charges, e.g. bank charges. (Hr'g Tr. 125).

The Recovery Account, which as of May 18, 2010, held a balance of $9,797.22, is described by Mr. Leshin as "a trust account where client funds that [Randall Leshin, P.A.] recover[s] for the clients go into." (Hr'g Tr. 122, PCX Hr'g Ex. 45).  The monies in the fund are obtained from collections from debtors whose accounts have been placed

with Randall Leshin, P.A. by the creditors of those debts. (Hr'g Tr. 130). Randall Leshin, P.A., draws its fees and costs for collecting those debts out of that account and then pays the balance to its creditor-customer. (Hr'g Tr. 130).  The monies withdrawn for the fees and costs are then placed into Randall Leshin, P.A.'s operating account. The Recovery Account is not an IOTA account and is not set up as a Trust Account. (Hr'g Tr. 155). Randall Leshin, P.A. collects 25% for its fees and costs from some of its creditor-clients but that amount may vary for each client. (Hr'g Tr. 143).  The Collection Agreement exemplars reflect that Randall Leshin, P.A., generally collects either 25% or 19% of the monies collected on behalf of its clients for fees and costs. (Hr'g Ex. 75).

The Operating Account, which as of May 18, 2010, held a balance of $4,553.24, is the account used for paying for the operation of the collection practice. (Hr'g Tr. 126, PCX Hr'g Ex. 45).

Randall Leshin, P.A., also holds four wholly separate accounts associated with the operations of its credit counseling business. (Hr'g Tr. 126).  Those accounts are also identified as Tax, Trust, Operating and Payroll Accounts.  The FTC does not seek to have the Defendants turn over these accounts for purposes of satisfying the Disgorgement Order because, according to the FTC, it wants to protect consumers who are receiving credit counseling. (Hr'g Tr. 126).

There was a savings account at Bank of America held by Randall Leshin, P.A., that contained $1.54 at the time that the Contempt Motion was filed (DE # 519 at 3).  The money remaining in that account was taken by the bank for service charges in or around July 2010. (Hr'g Tr. 133).

VI.     **LAW & ANALYSIS**

A.      **The Court's Contempt Power**

District courts have inherent and statutory power to enforce their Orders and to punish violators for contempt.  *Roadway Express. Inc., v. Piper*, 447 U.S. 752, 764-765 (1980).  Civil contempt is a remedial sanction designed and intended to obtain compliance with a court order or to compensate for damages sustained as a result of noncompliance. *Piambino v. Bestline Prod.'s;* 645 F. Supp. 1210 (1986), *citing McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1948).  In a civil contempt proceeding, the moving party must demonstrate by clear and convincing evidence that the underlying order was violated. *Commodity Futures Trading Com'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir.1992).  Once a prima facie showing of a violation has been made, the burden of production shifts to the alleged contemnor, who may defend his failure on the grounds that he was unable to comply. *Id.* (citation omitted). To find contempt, the court must determine that the order violated was clear and unambiguous and that the party to be charged had notice of the order but did not diligently attempt to comply.  *Popular Bank of Florida v. Banco Popular De Puerto Rico*, 180 F.R.D. 461, 465-66 (S.D. Fla. 1998) *citing, In re E.I. DuPont De Nemours,* 99 F.3d 363, 372 (11th Cir.1996). The failure to comply need not be with the intent to disobey a court order; indeed, intent to disobey is not a prerequisite to a finding of civil contempt. *Id.* Thus, the absence of willfulness does not relieve an entity from civil contempt.

B.      **Conclusions of Law**

1.      **It has been shown by Clear and Convincing Evidence that the Contempt Defendants violated the Court's January 29, 2010 Corrected Final Judgment of Disgorgement and Consumer Redress**

The FTC has shown by clear and convincing evidence that the Contempt

Defendants violated the Court's January 29, 2010 Corrected Final Judgment of Disgorgement and Consumer Redress (DE # 489).  It is undisputed in this matter that the individual Defendants, Charles Ferdon and Randall Leshin, were aware of the Court's January 29, 2010 Disgorgement Order and understood that the Order required the Defendants to pay $594,087.90 within thirty (30) days from the date of that Order.  It is further undisputed that the three Corporate Contempt Defendants, Randall Leshin, P.A., Express Consolidation, Inc., and Debt Management Counseling Center, Inc., which are all owned and operated by individual Defendant Randall Leshin, also were aware of the Disgorgement Order and understood that they were required to pay the sum set forth in that Order within thirty days.

It is also undisputed that as of the date of the August 9, 2010, evidentiary hearing on the FTC's Contempt Motion, none of the Contempt Defendants had paid any monies toward the satisfaction of the sums set forth in the Disgorgement Order.[16]

Thus, the FTC has met its burden of demonstrating by clear and convincing evidence that the Defendants have violated the Disgorgement Order.

2. **Defendants have not demonstrated that they made good-faith efforts to satisfy the Disgorgement Order and have not demonstrated that they are unable to comply with the Disgorgement Order**

The FTC argues generally that the income and luxurious lifestyles of the individual Defendants belie their claimed inability to pay any part of the disgorgement ordered by the Court; and, the FTC specifically challenges their claims that they are

---

[16] Defendants imply that their failure to comply with the Disgorgement Order is due, in part, to their belief that ceratin state exemptions applied to the funds sought by the FTC in the Motion for Contempt. However, "the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *SEC v. Solow*, 682 F. Supp. 2d 1312, 1325 (S.D. Fla. 2010).

entitled to exemptions to the Disgorgement Order under Florida State Law.

> a.   **The Court is not limited by Florida State Exemptions in reaching the Defendants' assets to satisfy the Disgorgement Order**

Once a prima facie case of contempt is established, the burden shifts to the defendant to produce detailed evidence to explain its noncompliance. *Id. (citing Citronelle-Mobile Gathering, Inc.*, 943 F.2d at 1301; *United States v. Roberts*, 858 F.2d 698 (11th Cir.1988)).  In this case, the Individual Contempt Defendants first argue that they have complied with the Disgorgement Order to the extent required by law, because the bulk of the assets that the FTC seeks to obtain are protected from collection under applicable Florida State laws and the Florida State Constitution.

In opposition to the Contempt Defendants' claims that Florida State exemptions should apply, the FTC argues that, in attempting to enforce a disgorgement order, this Court has the discretion to ignore state law exemptions that might normally apply under Florida law in garnishment and/or money judgment scenarios (DE # 552).  In support of its position, the FTC cites to several cases, including *SEC v. Solow*, 682 F. Supp. 2d 1312, 1325 (S.D. Fla. 2010), in which federal courts have rejected claims for protection of funds under state exemptions where those funds were sought to satisfy a disgorgement order issued by a federal court.

In *Solow*, the Court examined allegations by the SEC that a defendant secreted assets in an effort to avoid payment of a disgorgement order entered against him arising from violations of various securities laws. *SEC v. Solow*, 682 F. Supp. 2d 1312 (S.D. Fla. 2010).  In examining whether certain assets held by the defendant in that case could be reached by the court despite the defendant's assertion that the assets were protected by state law, the court stated, "a disgorgement order is more like an injunction for the

public interest than a money judgment....[i]t is this feature, the similarity to an injunction, that allows disgorgement orders, unlike judgment[s], to be enforced by civil contempt." *SEC v. Solow*, 682 F. Supp. 2d 1312, 1325 (S.D. Fla. 2010) *citing SEC v. Huffman*, 996 F. 2d 800, 802-03 (5th Cir. 1993). Thus, a Court has broad equitable powers to reach assets otherwise protected by state law to satisfy a disgorgement. *Id. citing SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972). Accordingly, a "district court can ignore state law exemptions as well as other state law limitations on the ability to collect a judgment in fashioning a disgorgement order." *Id.* Accord *Steffen v. Gray, Harris & Robinson, P.A.,* 283 F.Supp. 2d 1272, 1282 (M.D. Fla. 2003) (stating same).

In their papers and at the hearing, Contempt Defendants acknowledged that courts proceeding pursuant to disgorgement orders generally "are afforded more latitude in reaching assets exempt under state law" (DE # 554 at 3). However, Defendants assert that under the facts of this case, the state exemptions should not be ignored. Specifically, Defendants contend that the facts in this case are a far cry from *Solow* because the Defendants herein have not engaged in any misconduct akin to the defendant's actions in that case, such as creating off-shore accounts, making illicit transfers and otherwise dissipating funds to avoid satisfying a disgorgement order (DE # 554 at 4). However, this contention misses the mark. The determination of whether state exemptions apply to a federal court's efforts to enforce a disgorgement order does not turn on whether the potential contemnor's conduct rises to a particular level. Rather, as stated above, it is the nature of a disgorgement order that permits a federal court to reach monies that might otherwise be subject to an exemption. *See, e.g. SEC v. AMX, Int'l. Inc.*, 7 F.3d 71, 76 (5th Cir. 1993) (reversing and remanding case to trial court for failure to consider possibility of subjecting home to disgorgement order notwithstanding

federal exemptions available under "Debt Act," without citation to Defendant's conduct).

In response to this legal distinction, Defendants assert that in this case, because the Disgorgement Order was silent as to whether state exemptions would be ignored, Defendants reasonably believed that certain assets held by them were not subject to disgorgement.  However, this argument also is unavailing.  Again, for purposes of determining whether a federal court has the right to ignore state law exemptions in enforcing a disgorgement order, the subjective belief of the contemnor is irrelevant, because it is clear under the applicable case law that a federal court may, at its discretion, disregard those limitations.   This is not to say that a contemnor's actions or subjective beliefs might not relevant to whether, in the court's discretion, certain property should be exempt from a disgorgement order, but such considerations do not alter the absolute discretion that a federal court has to disregard such exemptions.  Indeed, it is clear that state exemptions cannot be used to shield satisfaction of a disgorgement order.   With these legal precepts in mind, the Court will now examine the specific exemptions raised by the Contempt Defendants to determine whether in the court's discretion, the state law exemptions are applicable to the funds at issue, and if so, whether those exemptions should be applied to this case.

i.    <u>Wages</u>

Defendants assert that Florida Statute § 222.11, entitled "Exemption of wages from garnishment," prevents the "earnings" which includes wages earned by the individual Defendants to be used to satisfy the disgorgement order.

The FTC disputes that this exemption applies to the instant proceedings and for support cites to language from the Act which amended certain portions of the wage exemption statute in 1993.  In particular, the FTC asserts that the exemption only applies

to "an attachment, a garnishment, or other legal process that arises as a result of a contract, a loan, a transaction, a purchase, a sale, a transfer, or a conversion." The FTC argues that these conditions are not present in this case, or generally in cases where the court seeks to collect monies related to a disgorgement order. 1993 Fla. Sess. Law. Serv. Ch. 93-256 (West ).

However, as stated previously, at the evidentiary hearing, the FTC clarified that, at this point, it does not seek to garnish or otherwise attach the future wages of the individual Defendants, thus, the undersigned does not need to address whether the statute cited by Defendants applies to the funds sought by the FTC.[17]

Nevertheless, it bears noting that the funds contained in the bank account opened in 2010 by Mr. Ferdon were admittedly funds derived from the liquidation of Mr. Ferdon's retirement accounts and other assets which totaled nearly $11,000.[18]  Thus, the monies in that bank account would not be entitled to any sort of wage exemption.  The other two accounts where Mr. Ferdon is named as an owner are the accounts held by Mr. Ferdon and his wife, and the account held by Mr. Ferdon and his mother.  As of March 2010, those accounts held respective balances of $615.93 and $9.18.  Mr. Ferdon testified that he had not deposited any money into the account held with his mother.  In addition, Mr.

---

[17] The undersigned recognizes that the Defendants assert that to the extent monies contained in some of the assets sought by the FTC are derived from the wages of the individual defendants, this statute applies.  However, the statute makes clear that those funds only retain their exempt status for six months, and thus, any funds at issue that have been placed in other financial institutions before March 2010, would no longer be considered wages under this exemption. Fla. Stat. § 222.11 (3).  Further, the undersigned questions whether in this case wages that have been passed to third parties or placed into other savings plans should still be considered wages for purposes of this exemption.

[18] This last four digits of this bank account are "7293".

30

Ferdon testified that a portion of the money that is contained in the joint account with his wife were monies that she deposited and not from Mr. Ferdon's wages.[19]  Thus, almost all of the monies sought by the FTC from Mr. Ferdon's bank accounts would not qualify for this exemption in any event.

As to Mr. Leshin, while the FTC has stated that it does not seek to reach the individual Defendants' wages, the FTC correctly notes in its Post-Hearing Brief Regarding Defendants' State Debtor Protection Claims, that earnings from a business controlled by a defendant are not exempt because they do not constitute "earnings" subject to exemption under Section 222.11(1)(a).  *In re Zamora*, 187 B.R. 783, 784 (Bankr. S.D. Fla. 1995); *In re Manning*, 163 B.R. 380, 382 (Bankr. S.D. Fla. 1994); *Brock v. Westport Recovery Corp.*, 832 So. 2d 209 (Fla. Dist. Ct. App. 2002).  As stated in *In Re Manning*:

> [A] debtor that owns or controls a business cannot exempt the funds he distributes to himself from the business simply by calling the money "wages." For the exemption to apply the debtor must not only perform personal services for the business, he must also receive regular compensation dictated by the terms of an arms-length employment agreement.

*In Re Manning*, 163 So. 2d, 382.  This same analysis was applied in *In re Zamora*, 187 B.R. 783 (Bankr. M.D. Fla.1995) in which a debtor, who owned a law practice as a sole practitioner and a marina, was not eligible for the wage exemption where the debtor was in total control of the businesses, including the amount of his compensation and the terms of his employment, and there was no employment contract between the debtor and his businesses. *Id.*

In response to this argument, Defendants only state that Mr. Leshin has always

---

[19]  The last four digits of this Bank Account are "4523".

received a salary that is reviewed by the board of directors and that is not under his "complete control" (DE # 554 at 10).  Defendants however fail to cite to support for this assertion in the record and otherwise fail to cite to any case law in support of their position.

Moreover, the Defendants' assertion on this point is belied by the record.  Mr. Leshin not only testified at the evidentiary hearing that "all profits" are run through him, but he testified that he recently did not take any compensation to insure that his business was able to meet its "obligations."  Thus, the compensation scenario is akin to that in *Zamora*, and thus, even if the undersigned determined that the wage exemption should apply in this matter, and the FTC sought those funds, Mr. Leshin would not be entitled to have the exemption applied to his compensation.  Thus, to the extent that the Bank Accounts that Mr. Leshin personally holds contain funds from Mr. Leshin's compensation received from the Corporate Contempt Defendants, those funds are not subject to the exemption.

Similarly, the $3,000 that Mr. Leshin gives to Mrs. Leshin each month is not protected by this exemption, because the funds are actually an extension of the compensation that Mr. Leshin receives from the Corporate Contempt Defendants, which have already been determined to not qualify as "earnings" for purposes of the exemption.[20]

### ii. Homestead Exemptions

It is uncontested that both Individual Defendants reside in their homesteaded

---

[20] Mrs. Leshin, however, is not a party to the underlying or contempt proceedings; therefore, as discussed below, the funds she held at the time of of the Disgorgement Order are not subject to disgorgement.

residences.  There is no question that homesteaded properties are protected from creditors under Florida law.

However, the FTC has made clear that it is not seeking to reach the individual Defendants' residences to satisfy the Disgorgement Order, thus, the undersigned need not determine whether under the facts of this case, the Court should honor the State Court homestead exemption.

### iii.  College Fund

Defendants argue that pursuant to Florida Statute § 222.22, the funds that Mr. Ferdon has contributed to the Florida Prepaid College Program for his daughter's education are exempt, and should not be used to satisfy the Disgorgement Order.  The FTC has not contested that these funds fall within the statutory exemption, but claims only that the Court should exercise its discretion to disregard this exemption.

Nevertheless, under the facts of this case, the undersigned concludes that the exemption should not be applied to these funds.  Mr. Ferdon testified at the evidentiary hearing that the monies that were paid into this account were paid by his wife, and submitted checks into evidence signed by his wife made to the Florida Prepaid College Plan for support of this claim. (Hr'g Ex. 68, 69).  However, Mr. Ferdon admitted that the account from which his wife paid for the college plan was the account used to pay for all of the couple's bills, and was the same account where both he and his wife deposited their respective pay checks.  Thus, particularly given that Mr. Ferdon's salary (approximately $80,000) throughout the course of this litigation, has been nearly double that of his wife's (approximately $44,000), and all of those monies combined were used to pay all of the household bills, including savings accounts, Mr. Ferdon has failed to establish that the monies paid into the college plan were paid for by his wife and not

him.

Morever, and more important for the undersigned's decision that these monies should not be exempted, is the fact that the Disgorgement Order reflects that between the time frame of May 2008 and November of 2009, the Contempt Defendants improperly collected monies in violation of the Stipulated Injunction.   The evidence demonstrates that throughout that time, Mr. Ferdon deposited the compensation that he received from the Corporate Contempt Defendants into the bank account that was used to make payments towards the Florida Prepaid College Plan.  The fact that Mr. Ferdon was able to save money for his daughter's college tuition during that time should not trump his obligation to pay some sum of money toward the satisfaction of the Disgorgement Order which was designed, in part, to "compensate the consumers whose money was taken in violation of the Stipulated Injunction" (DE # 489 at 2).  Thus, the undersigned concludes that the state exemption should not be applied to this college fund.

### iv.   Retirement Account

Defendants argue that their retirement funds are exempt from being used to satisfy the disgorgement amount pursuant to Florida Statute § 222.21.  That statute is entitled, "Exemption of pension money and certain tax-exempt funds or accounts from legal processes," and generally exempts monies from retirement plans that have been approved by the IRS from being used to satisfy judgments.  Defendants argue this section applied to both ERISA-type and non-ERISA-type plans, and thus applies to both of the Defendants' 401(k) or IRA funds.[21]

_____

[21]  The FTC made much of Mr. Leshin's characterization of the funds under the 401(k), retirement plan and IRA.  However, for purposes of the instant analysis, whether the funds are characterized as either type of retirement or savings account, the undersigned determines that no exemption should apply under either Florida State exemptions or

34

For the same reasons discussed above, related to Mr. Ferdon's college savings plan, the undersigned concludes that the retirement accounts should not be exempt from the Disgorgement Order.  Specifically, the fact that the individual Defendants were able to place monies in their retirement funds, should not trump their obligation to pay sums due under the Disgorgement Order.

<strong>v.  <u>Life Insurance and Annuities</u></strong>

Defendants further argue that Mr. Leshin's life insurance policy is exempt from being used to satisfy the Disgorgement Order pursuant to Florida Statute § 222.14.  That section entitled, "Exemption of cash surrender value of life insurance policies and annuity contracts from legal process," provides in relevant part, "The cash surrender values of life insurance policies...shall not in any case be liable to attachment, garnishment or legal process in favor of any creditor of the person." Fla. Stat. § 222.14.

In *SEC v. Yun*, 208 F.Supp. 2d 1279, 1283 (M.D. Fla. 2002), the district court opined that the three annuity contracts at issue in that case were immune from process pursuant to Florida law, but nevertheless decided that it would not apply the exemption to those funds.  In so doing, the Court stated, "If this Court were forced to choose among [the party's] assets, it might, guided by Florida law, choose some other property over her annuity contracts.  But such is not the case here.  This Court, in its discretion, will not be guided by state law where its effect is to make a liable party judgment proof.  Therefore, this Court finds that [the party] must rely on her annuity contracts should that be necessary." *Id.* at 1284.

Like *Yun*, in the instant case, the exemptions raised by Mr. Leshin, in effect,

---

Federal ERISA exemptions.

35

render him disgorgement-proof.  Mr. Leshin has asserted that he is unable to satisfy the

Disgorgement Order, and to the extent that he holds any  assets, including the life

insurance and annuity contract at issue, he asserts that those assets are subject to

exemptions.  Under Mr. Leshin's argument, he has the ability to insulate himself from the

effects of the Disgorgement Order by keeping his assets in an exempt status and

spending his income as he chooses. The Court declines to adopt Mr. Leshin's position.

Thus, under these facts, the undersigned finds that the annuity and retirement funds at

issue should not be entitled to protection under the exemption.

Moreover, as to Mr. Leshin's Life Insurance policy, the evidence demonstrates

that after this case was settled in 2008, Mr. Leshin borrowed money against the cash

value of the policy in order to use it for "regular living purposes." (Hr'g. Tr. 96).  The

Defendants have provided no accounting of where or when this money was spent, and

thus, the undersigned finds that it is not appropriate in this case to extend protection to

the life insurance policy, where Mr. Leshin himself, has used its surrender value for

living expenses.  This conclusion is bolstered by the fact that Mr. Leshin explained at the

evidentiary hearing that he still spends a little less than $25,000 on monthly expenses,

not including payments on a mortgage.  Under these circumstances, there is no merit to

the claim that these monies should be protected by a state exemption, through the

exercise of this Court's equitable discretion.

### vi.  Property held as tenancies in the entireties

Defendants further assert that property that is held as tenancies in the entireties

also may not be reached by this court.  For support of this position, Defendants cite to

*McGregor v. Chierico*, 206 F. 3d 1278 (11th Cir. 2000) for the proposition that a court may

not force severance of a tenancy by the entirety for the purpose of taking the property

owned by a guilty spouse, because doing so works a partial taking of the innocent spouse's property. The theory behind this proposition is that the partial taking results from the fact that "[a] tenant by the entireties holds an indivisible right to own and occupy the entire property." *Havoco of Am., Ltd. v. Hill*, 197 F.3d 1135, 1139 (11th Cir.1999) (internal quotations omitted). To convert that right to own and occupy into a tenancy in common would effect an unlawful taking. *See United States v. One Single Family Residence*, 894 F.2d 1511, 1516 (11th Cir. 1990).

*Chierico* however is distinguishable from the instant case for a number of reasons. First, as explained by the Court in *Solow*, in *Chierico*, although the Eleventh Circuit held that a homestead held by a tenancy in the entirety could not be reached in a contempt proceeding because the wife was a completely innocent party to the alleged action that constituted contempt, "the Chierico opinion involved a final judgment, not a disgorgement order, and enforcement of a disgorgement order against property (real or personal) has been treated differently by courts from enforcement of a judgment." *Solow* at 1331-32 (citing *Steffen v. Gray, Harris & Robinson, P.A.*," 283 F.Supp.2d 1272, 1283 (M.D.Fla. 2003) (internal quotations omitted).

In addition, again as stated in *Solow*, the *Chierico* court was concerned about what effect the non-defendant spouse's innocence would have upon the validity of the district court's order that the Chiericos forfeit their jointly-held family home. In this case, the FTC does not seek, and this Court has not considered, the forfeiture of the jointly-held family home. Thus, the fact that a property is held by both an innocent and a culpable spouse, does not, in and of itself, lift that property out of the reach of a federal court seeking to enforce disgorgement order. Under the facts of this case, the undersigned concludes that the current balances of the bank accounts are not exempt

37

from being used to satisfy the Disgorgement Order based upon their joint-tenancy nature.

However, there is one additional matter that must be addressed in this area. Although the undersigned has concluded that the bank accounts held jointly by Mr. and Mrs. Ferdon will not be exempted by the tenancies in the entirety exemption, one of the bank accounts which is jointly held by Mr. Ferdon and his wife contains some assets that may solely belong to Mrs. Ferdon.[22]  Specifically, as stated above, the original Bank of America account held by the Ferdons is funded through each of the Ferdons depositing their respective pay checks into the account.[23]  Thus, Mrs. Ferdon, who by all accounts is an innocent spouse in this matter, should not have to forfeit money that came solely from her pay check.  However, because the de minimis amount currently contained in the Account is clearly less than the proportion that Mr. Ferdon has deposited into the account, to the extent that the bank account is relinquished to the FTC, the entire amount in the account is subject to the disgorgement.[24]

Thus, the undersigned has concluded, in her discretion, that under the facts of this case, the state exemptions should not limit or otherwise apply to the funds that the FTC seeks to recover from the Individual Defendants to satisfy the Disgorgement Order.

---

[22]  It is also questionable whether the bank account at issue is even met the requirements of a tenancy in the entirety property.

[23]  The last four digits of this Bank Account are "4523".

[24]  As stated above, it is unclear which of the three Bank Accounts identified in FTC Exhibit PCX 45 is the joint account held by Mr. Ferdon and his wife where they each deposit their pay checks, and which account Mr. Ferdon holds jointly with his mother.

b.   **Contempt Defendants Did Not Make In Good-Faith All**
**Reasonable Efforts to Comply with the Order and Have Not**
**Demonstrated that they are Unable to Comply with the**
**Disgorgement Order**

As stated above, once a party seeking civil contempt proves by clear and

convincing evidence that the contemnor has violated a court order, the burden of

production shifts to the contemnor to justify non-compliance with the order. *Steffen v.*

*Gray, Harris & Robinson, P.A.,* 283 F.Supp.2d 1272, 1282 (M.D.Fla. 2003), *citing*

*Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525,

1529 (11th Cir.1992).   Although the Court has determined that, in its discretion, the

exemptions relied on by Defendants should not be applied to funds at issue in this case,

the Court must address whether the Contempt Defendants have demonstrated that they

are unable to comply with the Disgorgement Order and have used good faith in all

reasonable attempts to do so.   For the following reasons, the undersigned concludes

that the Contempt Defendants have failed to meet their burden on this issue.

Inability to pay is generally a defense to civil contempt; however, inability to pay

is not a defense if the contemnor created the inability. See e.g., *Hodgson v. Hotard*, 436

F.2d 1110, 1116 (5th Cir. 1971); *Piambino v. Bestline Products, Inc.*, 645 F.Supp. 1210,

1215 (S.D.Fla. 1986).   In order to succeed on the inability defense, the alleged contemnor

"must go beyond a mere assertion of inability," *United States v. Hayes*, 722 F.2d 723, 725

(11th Cir. 1984), and establish that he has made "in good faith all reasonable efforts" to

meet the terms of the court order he is seeking to avoid.   *United States v. Roberts*, 858

F.2d 698, 701 (11th Cir. 1988); *Combs v. Ryan's Coal Co.*, 785 F.2d 970 , 984 (11th Cir.

1986).   Courts construe this requirement strictly, and thus even if the efforts made by

defendants are "substantial," "diligent" or "in good faith," the fact that a defendant did

not make "all reasonable efforts" to comply with the order, establishes that the defendant has failed to rebut the showing of contempt. *Commodity Futures Trading Comm. v. Wellington Precious Metals, Inc.*, 950 F. 2d, 1529.  Thus, Defendants must show "categorically and in detail" why they are unable to comply. *Piambino v. Bestline Products, Inc.*, 645 F.Supp. 1210, 1215 (S.D.Fla. 1986) (citations omitted).

In this matter, the individual Contempt Defendants argue that because they believed that the monies and funds that the FTC has identified in the Motion for Contempt were subject to the various state exemptions, that the Defendants' failure to relinquish those funds was based upon a good-faith belief that those funds were not subject to disgorgement.  In addition, the Defendants assert that the financial documents submitted in this case demonstrate that the Defendants lack the financial ability to comply with the Disgorgement Order.  For the following reasons, however, the undersigned finds that the Defendants have failed to make such a good faith showing and have also failed to demonstrate that they are unable to comply with the Disgorgement Order.

### i.    <u>Charles Ferdon</u>

At the outset, the undersigned acknowledges that the actions taken by Mr. Ferdon after the Disgorgement Order was issued are a far cry from many of the actions taken by the contemnor defendants in cases like *Solow*, *Chierico*, and *Yun*.  The record nevertheless supports a finding the Mr. Ferdon did not use all reasonable efforts to comply with that Order.  Rather, after the Disgorgement Order was entered by the Court, Mr. Ferdon seemingly took the position that if the FTC would not seek to reduce the full amount due under the Disgorgement Order, that he would not pay any monies towards the satisfaction of the Order.

In particular, sometime in March of 2010, Mr. Ferdon liquidated several assets including his Roth IRA, his 401(k) and his personal bank account, with the intent, according to his testimony, to pay the FTC a portion of the sums due under the Disgorgement Order.  However, when the FTC would not agree to seek a reduction of the amount due pursuant to the disgorgement, Mr. Ferdon elected to not pay any monies, and rather decided to keep the monies in a bank account.  Thus, while Mr. Ferdon may not have been able to satisfy the entire amount required by the Disgorgement Order, the fact that he did not use any of the monies available to him to attempt to satisfy the Order, undercuts any assertion that he made "all reasonable efforts in good faith to comply" with the Order. *See Piambino v. Bestline Products, Inc.*, 645 F.Supp. 1210, 1214 (S.D.Fla. 1986) (opining that person subject to a court order must comply to the fullest extent possible, regardless of whether such efforts result in compliance in whole or part).

In addition, it is curious that when Mr. Ferdon liquidated some of his assets  and created a new account for the purpose of paying the FTC monies related to the Disgorgement Order, that he created a joint account with his wife, rather than just opening a new account in his name only, or depositing the monies into his already-existing account that was only in his name.  By Mr. Ferdon's own legal argument regarding state exemptions, placing those funds into a joint account with his wife would remove those sums from the reach of the FTC, by creating a joint tenancy over those funds.  Thus, it appears that he wanted to retain the ability to claim an exemption despite liquidation of the accounts.

As mentioned above, the undersigned finds it a bit disingenuous that Mr. Ferdon testified that the Florida Prepaid College Plan was only paid for by his wife when in reality, the fund was paid for out of the couple's joint account where Mr. Ferdon regularly

deposited his earnings, which were considerably more than his wife's earnings.

In addition, although Mr. Ferdon's living expenses do not appear to be excessive, there has been no evidence introduced from the Defendants that Mr. Ferdon attempted to save money in an effort to pay off the disgorgement amount, whether that pay off be in small payments or in a lump sum amount.

Moreover, Mr. Ferdon did not seek relief from this Court regarding his purported inability to satisfy the Disgorgement Order and further, did not seek guidance from this Court as to whether any Florida State or Federal exemptions would apply to the funds at issue. Accordingly, based upon the foregoing, the undersigned concludes that Mr. Ferdon has not met his burden of demonstrating either that he is unable to satisfy the Disgorgement Order or that he in good faith made all reasonable efforts to comply, and thus is in contempt of the Disgorgement Order.

### ii. Randall Leshin

Defendant Randall Leshin's conduct following the entry of the Disgorgement Order utterly fails to demonstrate that Mr. Leshin reasonably attempted to comply with that Order. Unlike Mr. Ferdon, there is no indication that Mr. Leshin even readied any assets through liquidation to pay to the FTC towards the satisfaction of the amounts due under the Order.[25]  Nor did Mr. Leshin seek relief from this Court regarding his alleged inability to pay the amount due under the Order, or to have the Court render a determination

---

[25]  The undersigned is aware that attached to Mr. Leshin's Declaration, which was submitted as an exhibit in this matter, is a letter that states that Mr. Leshin would be willing to liquidate certain of his assets in an effort to settle the matter with the FTC. (Hr'g Ex. 1).  However, there is no indication that Mr. Leshin liquidated those assets, and in any event, the record establishes that Mr. Leshin made his willingness to liquidate and use those assets to satisfy the Disgorgement Order, contingent upon the FTC agreeing to seek a reduction in the overall disgorgement amount.

regarding the applicability of the state exemptions on which Mr. Leshin now seeks to rely as providing a shield from him having to pay any sums under the Order.

These omissions are even more glaring given that Mr. Leshin is a sophisticated attorney with more than twenty-three years experience primarily in the field of debt collection, bankruptcies and commercial litigation.

Moreover, although the Financial Statement submitted by Mr. Leshin in March 2010 indicates that his assets have declined since the settlement of the case with the FTC in May of 2008, the record does not indicate that Mr. Leshin is without means to satisfy, at least a portion of, the Disgorgement Order. *See Piambino v. Bestline Products, Inc.*, 645 F.Supp. 1210, 1215 (S.D.Fla. 1986).  In addition, to the extent that Mr. Leshin has an inability to comply with the Disgorgement Order, that inability is created by Mr. Leshin, and thus not a defense to comply with the Order.  In this regard, the Court takes particular note of the following facts that were established through the testimony and exhibits presented at the evidentiary hearing:

1.  Mr. Leshin is the sole officer of Randall Leshin, P.A., Express Consolidated, Inc., and Debt Management Counseling Center, Inc., and all income for those entities, pass through to him;

2.  Mr. Leshin was compensated $513,662 in 2007; $395,268.00 in 2008 and estimated his income to be approximately $200,000 in 2009 and 2010;

3.  Mr. Leshin has expenditures of approximately $25,000 per month, including $1,000 in clothing;

4.  Mr. Leshin deposits approximately $1,400 each month into his adult daughter's account despite the fact that his daughter has a college degree and full-time employment;

5. Mr. Leshin gives his wife $3,000 each month for running the household;

6. Mr. Leshin and his wife have already satisfied the mortgage on their Fort Lauderdale home valued at approximately $425,000.

Thus, there is nothing before the Court that would warrant a finding that Mr. Leshin is "unable" to pay the sums due under the Disgorgement Order.

Further, Mr. Leshin was less than forthcoming in this matter when he failed to disclose in a number of Financial Statements submitted to the FTC, several facts relevant to his assets and expenditures.  Specifically, Mr. Leshin did not indicate on any of the Financial Statements submitted to the FTC, or prior to the evidentiary hearing, that his wife, who does not work outside of the home, holds her own bank account in which she deposits the $3,000 that Mr. Leshin gives her each month.  Mr. Leshin also did not disclose in any of the Financial Statements that Randall Leshin, P.A. actually holds eight different bank accounts rather than four accounts; and, further that the "Recovery Account" is not actually a true trust account held for the funds of creditor-clients, but also holds Randall Leshin, P.A. fees and costs, which are put into the firm's operating account.  Finally, Mr. Leshin failed to report two sources of income in his March 2010 Financial Statement: he did not report the 1099 income from Express Consolidated, Inc., in the form of an expense account and cell phone; and, he did not report the fact that DMCCI was paying his legal expenses of $1,000 each week.  Based upon these omissions, the undersigned finds Mr. Leshin lacked candor in self-reporting assets that could be used to satisfy the Disgorgement Order.

Thus, based upon the foregoing, the undersigned concludes that Mr. Leshin has not met his burden of demonstrating either that he is unable to satisfy the Disgorgement Order or that he in good faith made all reasonable efforts to comply with the Order, and

thus is in contempt of the Disgorgement Order.

However, to the extent that the FTC seeks to collect on monies deposited into Mrs. Leshin's bank account, there is no evidence that Mr. Leshin has control over those funds, and there have been no allegations that the money deposited into that account was the result of a fraudulent transfer. *See. e.g,. SEC v. Hickey*, 322 F. 3d 1123 (9th Cir. 2003) (holding that district court could freeze brokerage's assets to enforce contempt order where contemnor exercised total and complete control over the brokerage). The undersigned notes that although the FTC requested at the evidentiary hearing, when the FTC first learned of the account, that Mr. Leshin be disgorged of any sums contained in that account, in its Post-Hearing brief, the FTC did not specifically request that Mrs. Leshin's bank account, held solely in her name, be relinquished (DE # 552). In addition, the FTC has not cited to any case law or applicable statute that would permit the Court to reach Mrs. Leshin's bank account where she has not been joined as a party to this proceeding, and likewise, have failed to identify the account or the amount of money contained in that account with any specificity. Thus, even if the Court were able under the law to reach Mrs. Leshin's bank account held solely in her name, the Court has not been provided enough information to fashion a specific order regarding that account. As such the Court is without the ability or authority order that Mrs. Leshin relinquish those funds.

### iii. <u>Corporate Entities</u>

As to the Corporate Contempt Defendants, there is no evidence that they, through Randall Leshin, attempted to comply with the Disgorgement Order. The Defendants failed to produce any evidence of what the Corporate Contempt Defendants attempted to do in an effort to comply with the Order. In fact, although Randall Leshin, P.A. apparently

provides two different services to different clients, there has been no argument or citation to applicable law that suggests that the funds generated by the "creditor side" of the firm could not be or should not be used towards the satisfaction of the Disgorgement Order.

As to the specific accounts, based upon the evidence, the undersigned finds that the monies held by Randall Leshin P.A., in the Tax and Payroll accounts should not be used to satisfy the Disgorgement Order. Those Accounts are solely used for the payment of wages to the employees and payment of taxes related to those wages.  Accordingly, those Accounts should not be relinquished to the FTC.  However, the evidence demonstrates that the monies in the Recovery Account of Randall Leshin, P.A., hold more than just monies that are to be distributed to the firm's clients.  Rather, the fund also holds fees and costs that are owed to the firm.  At the evidentiary hearing, Mr. Leshin acknowledged that sometimes Randall Leshin, P.A. collects 25% for its fees and costs from what it collects for the creditor-client but that amount may vary for each client.  (Hr'g Tr. 143).  However, the exemplars of the Collection Agreements submitted to the Court reflect both a 25% and a 19% fee. (Hr'g Ex. 75). This money should be disgorged.[26]

In addition, regardless of the financial documents submitted to the Court, it is undisputed that DMCCI, pays the legal fees of Mr. Leshin in the amount of $1,000 each week.  Similarly, Express Consolidation provides Mr. Leshin with both an expense account and a cell phone.  Accordingly, under these facts, the Defendants have failed to

---

[26]  The undersigned finds no merit to the Defendants' argument that these funds cannot be reached to satisfy the Disgorgement Order because, among other things, those funds are held for the operation of the law firm (DE # 533 at 14).  The Disgorgement Order at issue clearly directed disgorgement of funds from Randall Leshin, P.A., without regard to whether such funds were necessary for the operation of that law firm.

demonstrate that the Corporate Contempt Defendants are unable to comply with the Disgorgement Order or that those entities have made all reasonable efforts to comply in good faith with the Order, and thus they are also found to be in contempt of the Disgorgement Order.

However, the FTC has not sought to have the $1,000.00 paid each week forwarded to the FTC, nor has the FTC requested that the monies used to pay for Mr. Leshin's expense account or cell phone be used to satisfy the Disgorgement Order.  Thus, the undersigned concludes, as apparently conceded by the FTC, that Corporate Defendants, Express Consolidation, Inc., and DMCCI, do not currently hold assets that may be subject to disgorgement; and, therefore, in accordance with the submission made by the FTC, they would be able to "purge" themselves of contempt if an order of contempt was entered.

### VII.   SANCTIONS FOR VIOLATION OF THE INJUNCTION

As the undersigned has concluded that the Contempt Defendants should be held in civil contempt, it is appropriate to determine what sanctions should be imposed for their contemptuous conduct.

A civil contempt sanction may serve to either (1) coerce the contemnor to comply with a court order, or (2) compensate a party for losses suffered as a result of the contemnor's act. *Sheet Metal Workers Local 441 Health & Welfare Fund, et al., v, Unatank Corp.*, 2008 WL 2163915 *2 (S.D. Ala. May 19, 2008)(citing *McGregor v. Chierico*, 206 F.3d 1378, 1385 n. 5 (11th Cir.2000)).

The undersigned concludes that incarceration is a proper sanction for the individual Defendants' contempt of this Court's order.  In addition, the undersigned recommends the incarceration of Randall Leshin, as the owner of Randall Leshin, P.A., to

coerce compliance by Randall Leshin, P.A.

In light of the prior finding of contempt by this Court, under the facts of this case, incarceration is the least coercive sanction necessary to encourage the Defendants' compliance with this Court's Order.  It is clear that monetary sanctions will not suffice due to the difficulty experienced by the FTC in collecting the amount due under the Disgorgement Order.  However, rather than imposing this sanction immediately, the undersigned recommends that the Court issue a conditional order, permitting the individual Defendants to avoid sanctions by purging themselves of this contempt through prompt compliance, and specifically relinquishing the above-identified assets. Thus, the undersigned recommends that this Court not order that the individual Defendants be taken into custody if they purge themselves of this contempt within ten days from the entry of an Order adopting this Report and Recommendation and holding them in contempt.

VIII.   <u>CONCLUSION</u>

Thus, based upon the above findings and conclusions, and a review of the record as a whole, it is hereby

**RECOMMENDED** that Plaintiff Federal Trade Commission's Motion for Order to Show Cause Why Defendants Randall L. Leshin, Randall Leshin P.A., Express Consolidation, Inc., Charles Ferdon; and Non-Party Debt Management Counseling Center, Inc., Should not be Held in Contempt for Violating the Corrected Final Judgment of Disgorgement and Consumer Redress (DE # 519) be **GRANTED**, in part.  It is further

**RECOMMENDED** that Contempt Defendants, be found to be in civil contempt of court for violating the Corrected Final Judgment of Disgorgement and Consumer Redress

issued on January 29, 2010 (DE # 489). It is further

RECOMMENDED that the Contempt Defendants, as separately set forth below, be ordered to either relinquish the following accounts or ordered to pay the sums equal to the total amount of $92,671.00, as follows:

<u>Charles Ferdon</u>

1.     Funds in two Bank of America Accounts valued on May 3, 2010 at $11,750.55; consisting of one account with a balance of $56.37; and, a second account ending in "7293" with a balance of $11,694.18, which is primarily comprised of monies from Mr. Ferdon's liquidated retirement accounts as identified by the FTC.  The $56.37 amount reflects the lesser amount of the two accounts held by Mr. Ferdon jointly with his wife or with his mother.  Because the Court is unable to ascertain, based upon the record, which amount (either $56.37 or $172.45) correlates to which account.  Thus, because the FTC has not established and/or identified what amount is held in which account, the Court, in its discretion, has elected to recommend that Mr. Ferdon be disgorged of the lesser of those two amounts, representing the joint account held with his wife.  Because there is no evidence that any of Mr. Ferdon's monies are in the joint account that he holds with this mother, the undersigned recommends that he not be required to relinquish that account or the monies contained therein.

2.     Funds held in a college savings plan with the Florida Prepaid Program, Account number with the last four numbers "8732" and valued at $9,517.05, on April 27, 2010.

Thus, Mr. Ferdon must pay $21,267.60 to the FTC, in order to purge himself of the

Court's finding of contempt, if he elects not to relinquish his rights and interests in those Accounts in their entirety.

<u>Randall Leshin</u>

1.      Cash value of life insurance policy valued at $23,253.00 on March 4, 2010;

2.      IRA funds in a Prudential annuity contract valued at $35,545.43 on April 5, 2010;

3.      Funds in two Pershing brokerage accounts valued at $4,363.55 according to statements dated March 31, 2010 and April 30, 2010;

4.      Funds in three personal Bank of America Accounts and one Washington Mutual Account (now Chase) with the total value of $1,517.74 at May 11, 2010.

Thus, if Mr. Leshin elects not to relinquish all interest and title to the FTC of these Accounts, the total amount of money that Mr. Leshin must relinquish, as an individual Contempt Defendant, in order to purge himself of the Court's finding of contempt is the sum of the Accounts listed above, totaling $64,679.72.

<u>Corporate Defendants</u>

Funds held in the bank accounts of Randall Leshin, P.A., referred to as "Recovery" and "Operating" Accounts related to the collection side of that firm, which totaled $14,418.91 as of May 18, 2010.  To the extent the sums held in the Recovery Account belong to creditor-clients of the firm, Randall Leshin, P.A. should be directed to provide an accounting of those monies, which sets forth the exact fees and costs due to the firm, which will not be forwarded to the clients; and then relinquish those Accounts to the FTC.

If Randall Leshin, P.A. elects not to relinquish all rights and interests in the Recovery and Operating Accounts to the FTC, the total amount of money that Mr. Leshin

must relinquish, on behalf of Randall Leshin, P.A., in order to purge that entity of the

Court's finding of contempt, is $6,723.68; consisting of $2,170.44 which represents 22%

of the total amount of $9,865.67 of the Recovery Account, which this Court, in its

discretion, finds is owed to Randall Leshin, P.A., as fees and costs from the funds

contained in the Recovery Account as of May 18, 2010; and, the entire $4,553.24 sum held

by the Operating Account as of May 18, 2010.  It is further

**RECOMMENDED** that the Court order that Contempt Defendants, Randall Leshin,

Charles Ferdon, and Randall Leshin, P.A., must comply with any Order adopting this

Report and Recommendation within (10) days of the issuance of that Order. It is further

**RECOMMENDED** that the Court order, should either of the Individual Contempt

Defendants not relinquish the assets identified above to the FTC within ten (10) days of

the issuance of the Court's Order adopting this Report and Recommendation and/or

holding the Contempt Defendants in contempt, that the infringing Defendant be taken into

custody and incarcerated until such time as he fully complies with this Court's order.  It is

further

**RECOMMENDED** that should Randall Leshin, P.A. not comply with relinquishing

the assets identified above to the FTC within (10) days of the issuance of the Court's

Order adopting this Report and Recommendation and/or holding the Contempt

Defendants in contempt, that Defendant Randall Leshin be taken into custody and

incarcerated until such time as Randall Leshin, P.A., fully complies with this Court's

order.  It is further

**RECOMMENDED** that the FTC be permitted to apply to the Court to convert to a

money judgment any unpaid balances of the disgorgement amount of $594,987.90, plus

interest, as requested by the FTC in Part V of its Proposed Order (DE # 519-1).

The parties will have fourteen days from the date of this Order within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned. Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED in Miami, Florida, on February 15, 2011.

_Andrea M. Simonton_
ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE